UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

STACI METCALF and BRAD METCALF,
Individually and on behalf of E.M.,
A.M., and O.M., minor children,

    Plaintiffs,

    v.                                                          CAUSE NO. 1:23-cv-683

MICHELLE LYDAY, MICHAEL
MCNEAR, LINDSEY BRUCE, CORTNEY
DEMETRIS, M.D.,

    Defendants.

## COMPLAINT AND JURY DEMAND

1.  Staci and Brad Metcalf ("the Metcalfs") are a married couple with three minor children, O.M, A.M. and E.M.

2.  On March 1, 2022, Staci took E.M., who was four-months-old, to the hospital because E.M. was vomiting and lethargic. Medical professionals discovered bruising on E.M. and that E.M. had a brain injury. Cortney Demetris, M.D. ("Dr. Demetris") told law enforcement officers and employees of the Indiana Department of Child Services ("DCS") that they were the result of abusive head trauma which occurred in the previous forty-eight hours.

3.  Dr. Demetris's opinions were egregiously wrong and she knew or should have known that they were wrong. Demetris shared her opinions with Michelle Lyday, Michael McNear, and Lindsey Bruce ("DCS Defendants"), knowing that they

would use these statements to violate Plaintiffs' constitutional rights. Those opinions led to the removal of E.M. from the Metcalf home for about two months.

4.    The DCS Defendants misrepresented the medical conclusions to others within DCS and to the state court, which also resulted in a violation of Plaintiffs' constitutional rights.

5.    The Metcalfs, individually and on behalf of their minor children, O.M., A.M., and E.M., seek redress for violation of their civil rights under federal law and the Fourth and Fourteenth Amendments to the United States Constitution.

6.    This action is brought under 42 U.S.C. § 1983.

## The Plaintiffs

7.    The Metcalfs reside in Boone County, Indiana with their minor children, O.M., A.M., and E.M.

## The Defendants

8.    At all times relevant to this complaint, Michelle Lyday ("Lyday") was a Family Case Manager for the DCS, Boone County Office. Pursuant to 42 U.S.C. § 1983, Lyday was acting under color of state law by virtue of her position at DCS.

9.    At all times relevant to this complaint, Michael McNear ("McNear") was a Family Case Manager Supervisor for the DCS, Boone County Office. Pursuant to 42 U.S.C. § 1983, McNear was acting under color of state law by virtue of his position at DCS.

10.   At all times relevant to this complaint, Lindsey Bruce ("Bruce") was a Family Case Manager for the DCS, Boone County Office. Pursuant to 42 U.S.C. § 1983, Bruce was acting under color of state law by virtue of her position at DCS.

11.   At all times relevant to this complaint, Dr. Demetris was a doctor with a specialty in child abuse pediatrics who worked on the Child Protection Team at Peyton Manning Children's Hospital at Ascension St. Vincent ("Peyton Manning"). Her principal place of business is in Marion County, Indiana. Pursuant to 42 U.S.C. § 1983, Demetris was a state actor by virtue of the close nexus between the State of Indiana and her challenged conduct in this case.

12.   Because they acted knowingly, recklessly and in disregard of well-established law, with no objectively reasonable basis for her actions, Defendants do not have qualified immunity from damages under the standards set forth by the United States Supreme Court, the Seventh Circuit, and this Court.

13.   Demetris, as a non-governmental official, cannot assert qualified immunity from suit under § 1983.

### JURISDICTION AND VENUE

14.   This Court has original jurisdiction of this action under 28 U.S.C. § 1331 as a civil action arising under the Constitution and laws of the United States.

15.   Venue in this Court is proper under 28 U.S.C. § 1391(a) because this is the judicial district in which a substantial part of the events giving rise to the claims occurred.

## FACTS

16.  At around 10:00 a.m. on February 28, 2022, Staci, a registered nurse, noted some small bruises on E.M.'s lower left side when changing his diaper.

17.  E.M. began vomiting at approximately 2:30 p.m. that same day and did not eat much that night.

18.  On the morning of March 1, 2022, E.M. was taken to the babysitter, who called Staci around noon to report that E.M. was very lethargic and acting abnormally.

19.  Staci picked E.M. up from the babysitter and called E.M.'s pediatrician, who told Staci to take E.M. to the emergency room at Peyton Manning.

20.  At the hospital, medical professionals also noted the bruising and discovered that E.M. had a brain bleed. A surgery was performed on E.M. to address the brain injury.

21.  Dr. Demetris was a member of the Child Protection Team at Peyton Manning.

22.  The Child Protection Team at Peyton Manning was established to investigate allegations of abuse or neglect.

23.  The Child Protection Team at Peyton Manning works for DCS as medical investigators in cases involving suspected child abuse and neglect.

24.  Dr. Demetris began an investigation of the cause of E.M.'s injuries to determine whether they were the result of child abuse or neglect.

25.  Dr. Demetris did not provide any medical treatment to E.M.

26.   Dr. Demetris had worked previously with DCS on dozens of cases involving child abuse and neglect.

27.   A regular part of Dr. Demetris's employment was to act as a medical investigator on behalf of DCS to determine whether a child's injuries were the result of abuse or neglect.

28.   When investigating E.M.'s injuries, Dr. Demetris was acting as a medical investigator on behalf of DCS.

29.   Dr. Demetris met with the DCS Defendants and law enforcement personnel to discuss E.M.'s case.

30.   Dr. Demetris knew that the DCS Defendants and law enforcement personnel considered her an authoritative source on medical issues related to child abuse and neglect.

31.   At the meeting, Dr. Demetris told the DCS Defendants and law enforcement personnel that E.M.'s medical condition was the result of physical abuse that occurred within the forty-eight hours before E.M. was taken to the emergency room.

32.   At the meeting, Dr. Demetris told the DCS Defendants and law enforcement personnel that E.M.'s medical condition was the result of a violent acceleration/deceleration force.

33.   At the meeting, Dr. Demetris told the DCS Defendants and law enforcement personnel that E.M.'s condition was not adequately explained by pre-existing medical conditions.

34.  Dr. Demetris and the others who attended the meeting understood that the Metcalfs had been the only adults who had cared for E.M. in the forty-eight hours before E.M. was taken to the emergency room.

35.  Dr. Demetris and the others who attended the meeting knew that if this window of possible abuse was expanded, then the Metcalfs would not be the only suspects.

36.  When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that a likely result of the timeframe for E.M's injuries that she was providing would result in a separation of E.M. from his family.

37.  When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that it would be unlikely for E.M. to be separated from his family if it was suspected that someone else had caused E.M.'s injuries.

38.  When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that E.M.'s treating physicians did not agree with this representation.

39.  When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that the separation of a child from his family through state intervention without sufficient cause constituted a violation of the family's civil rights.

40.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that E.M.'s neurosurgeons diagnosed a brain injury that occurred more than forty-eight hours before E.M. was taken to the emergency room.

41.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that a prior brain injury would make E.M. more susceptible to brain injuries that are not caused by physical abuse.

42.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that E.M.'s neurosurgeons thought that E.M.'s brain injury was caused by something other than physical abuse.

43.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that E.M.'s radiologists diagnosed a brain injury that occurred more than forty-eight hours before E.M. was taken to the emergency room.

44.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that E.M.'s treating physicians were of the opinion that they could not date E.M.'s injuries to the forty-eight hours before E.M. was taken to the emergency room.

45.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that E.M.'s treating physicians disagreed with her dating of the injuries.

7

46.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that E.M.'s ophthalmologist said that the physical findings that Dr. Demetris was relying upon were nondiagnostic.

47.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that E.M.'s retinal hemorrhage could have been caused by E.M.'s neurosurgery.

48.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that E.M.'s retinal hemorrhages were not severe.

49.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that E.M.'s retinal hemorrhages were minor.

50.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that testing was being done to see whether E.M.'s medical condition was the result of genetic factors.

51.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she knew that there was no history of trauma or abuse in E.M.'s family.

52.   When Dr. Demetris made this representation to the DCS Defendants and law enforcement personnel at the meeting, she based her diagnosis of physical abuse largely on the Metcalfs' failure to give her an explanation for E.M.'s injuries

8

while knowing that the Metcalfs could not have provided such an explanation if they were not present when the injuries occurred.

53.    Dr. Demetris intended for the DCS Defendants to rely on her opinions when determining whether allegations of child abuse should be substantiated against the Metcalfs.

54.    The DCS Defendants relied on Dr. Demetris's opinions when they substantiated allegations of child abuse against the Metcalfs.

55.    Dr. Demetris intended for the DCS Defendants to rely on her opinions when DCS was determining whether to file a petition alleging that E.M. was a Child in Needs of Services ("CHINS").

56.    Dr. Demetris intended for the DCS Defendants to rely on her opinions and file a petition alleging that E.M. was a CHINS.

57.    Dr. Demetris intended for E.M. to be designated as a CHINS.

58.    Dr. Demetris intended for the State of Indiana to intervene in the Metcalfs' familial relationship.

59.    The DCS Defendants relied on Dr. Demetris's opinions when they filed a petition seeking to have E.M. designated a CHINS.

60.    Alternatively, the DCS Defendants misrepresented Dr. Demetris's opinions both within DCS and to the state court overseeing the CHINS proceedings.

61.    As a direct and intended result of Defendants' actions, E.M. was removed from the Metcalf home until May 20, 2022.

62.   As a direct and intended result of Defendants' actions, DCS wrongfully substantiated allegations of physical abuse against the Metcalfs on April 2, 2022.

### COUNT I – VIOLATIONS OF 42 U.S.C. § 1983

63.   Plaintiffs incorporate by reference the previous allegations in this complaint.

64.   Demetris violated the Plaintiffs' due process rights under the Fourteenth Amendment when she misrepresented that E.M's brain injury happened within the forty-eight hours before E.M. was taken to the emergency room.

65.   The DCS Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented Dr. Demetris's conclusion regarding whether E.M's brain injury happened within the forty-eight hours before E.M. was taken to the emergency room.

66.   Demetris violated the Plaintiffs' due process rights under the Fourteenth Amendment when she misrepresented that E.M.'s brain injury was the result of physical abuse.

67.   The DCS Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented Dr. Demetris's conclusion regarding whether E.M.'s brain injury was the result of physical abuse.

68.   Demetris violated the Plaintiffs' due process rights under the Fourteenth Amendment when she misrepresented that E.M.'s retinal hemorrhages were the result of physical abuse.

69. The DCS Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented Dr. Demetris's conclusion regarding whether E.M.'s retinal hemorrhages were the result of physical abuse.

70. Demetris violated the Plaintiffs' due process rights under the Fourteenth Amendment when she misrepresented that E.M.'s bruising was the result of physical abuse.

71. The DCS Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented Dr. Demetris's conclusion regarding whether E.M.'s bruising was the result of physical abuse.

72. Demetris violated the Plaintiffs' due process rights under the Fourteenth Amendment when she omitted the fact that E.M.'s treating physicians disagreed with her opinions.

73. The DCS Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented Dr. Demetris's conclusion regarding whether E.M.'s treating physicians disagreed with her opinions.

74. The DCS Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented Dr. Demetris's conclusion regarding whether E.M.'s injuries were the result of physical abuse when substantiating allegations that the Metcalfs physically abused E.M.

75. Plaintiffs have been damaged as a result of Defendants' wrongful conduct.

76. For each violation of 42 U.S.C. § 1983, the Metcalfs individually, and on behalf of their minor children, seek to recover the following:

    a.    Compensatory damages in an amount to be determined by a jury;

    b.    Punitive damages in an amount to be determined by a jury;

    c.    Reasonable attorney and expert fees pursuant to 42 U.S.C. § 1988; and

    d.    Any further relief that may be appropriate.

WHEREFORE, Plaintiffs pray for damages in an amount of money which will fairly and adequately compensate them for all losses, injuries and damages, for the costs of this action, reasonable attorney's fees, and for all other relief just and proper under the circumstances.

## JURY DEMAND

Plaintiffs request a trial by jury.

Respectfully submitted,

WILLIAMS & PIATT, LLC


/s/ Brad A. Catlin
Brad Aaron Catlin, Atty. No. 21570-29
301 Massachusetts Ave., 2nd Floor
Indianapolis, IN 46204
Tel: (317) 633-5270
Fax: (317) 426-3348
brad@williamspiatt.com

ATTORNEYS FOR PLAINTIFFS